IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TORREY LEVARR ADAMS,<br><br>                   Petitioner,<br><br>vs.<br><br>SHAWN HATTON, Warden, Salinas Valley State Prison,[1]<br><br>                   Respondent. | No. 2:16-cv-01029-JKS<br><br>MEMORANDUM DECISION |

Torrey Levarr Adams, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Adams is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Salinas Valley State Prison. Respondent has answered, and Adams has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On May 15, 2012, Adams, along with co-defendant Darrell Miller, was charged with the murder of Antonne Nelms (Count 1, with two special circumstances) and two counts of attempted murder (Counts 2 and 3, Eric Harris and Tushawn Cooks, respectively). Adams was also charged with possession of cocaine for sale (Count 4) and being an ex-felon in possession of a firearm (Count 5). As to Counts 1, 2, and 3, a gang enhancement was alleged, and an arming allegation was alleged as to Count 4. The information further alleged that Adams had suffered a prior 1999 assault with a deadly weapon conviction within the meaning of the Three Strikes

---

[1] Shawn Hatton is substituted for William Muniz as Warden, Salinas Valley State Prison. FED. R. CIV. P. 25(d).

Law[2] as well as two prior convictions. Adams pled not guilty, and proceeded to a joint trial with Miller before separate juries. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Adams and the evidence presented at trial:

> On the afternoon of December 20, 2010, Nelms was shot and killed while walking down the street with friends Harris and Cooks. The bullet that killed him came from a car driven by [Adams], and occupied by Darrell Miller and Tyrone Allen.
> Allen testified for the prosecution at [Adams] and codefendant Miller's joint trial pursuant to an agreement that required him to, among other things "provide complete, truthful information and testimony" in exchange for a maximum sentence of 13 years in state prison.[FN3] The facts concerning [Adams], Miller, and Allen's activities on the day of the shooting, December 20, 2010, are taken from Allen's testimony at trial.
>
> FN3. [Adams] and Darrell Miller were tried together with separate juries.
>
> Allen and Miller were approximately 20 years old at the time of the shooting. They had been friends since elementary school and were "like brothers." [Adams] was like a father to Miller. Allen had known [Adams] as long as he had known Miller and considered Miller and [Adams] "family." Allen denied any gang affiliation, but said that [Adams] is a Blood, explaining that [Adams] had told him he was a Blood.
> On the day of the shooting, Allen and Miller planned to visit the grave site of their mutual friend Robert Haynes to commemorate Haynes's birthday (December 20th). Haynes, a member of the Oak Park, Fourth Avenue (FAB) street gang, had been murdered in 2008 by members of the Guttah Boyz street gang in what Allen described as a "gang-related" killing.
> Sometime around 12:30 p.m. on the day of the shooting, Allen went to Miller's home. Shortly thereafter, [Adams] showed up driving Miller's mother's car, and asked if they wanted to accompany him to SD Mart in South Sacramento to make a payment on a watch. Allen and Miller agreed to go with [Adams] to SD Mart because they thought they would be able to stop by Haynes's grave site, which is in the same area. [Adams] drove, Miller sat in the front passenger seat, and Allen sat in the backseat behind Miller. Once they were inside the car, [Adams] pulled out a .38 caliber revolver and asked Miller to hold it. Miller placed the gun inside a sling he was wearing on his arm. Six days earlier, on December 14, 2010, Miller was shot in the arm during an altercation between members of the Oak Park Bloods and the G–Parkway Starz street gangs at Fly Cuts in

---

[2] CAL. PENAL CODE § 667(e)(2)(A)(ii) (mandating an indeterminate sentence of 25 years to life imprisonment for a defendant convicted of a felony when that defendant "has two or more prior felony convictions").

2

South Sacramento.  Miller told Allen and a sheriff's detective that he was at the barbershop waiting to get a haircut at the time of the shooting.

The trio drove to SD Mart off of Mack Road and remained there for about 20 minutes.  When they returned to the car, Miller gave the gun back to [Adams].

[Adams] then drove to the Evergreen Shopping Center on Mack Road and Center Parkway.  The shopping center is a well known hang out for Starz and G–Parkway gang members and is not an area Allen and Miller usually frequent because of "the whole situation over there."  Allen recalled seeing Nelms, Harris, and Cooks in the parking lot, and a surveillance video showed [Adams] looking out into the parking lot in the direction Nelms, Harris, and Cooks were walking.  According to Allen, "[T]here wasn't nothing said.  We just got out of the car."  [Adams] and Miller went into Fashion Times where [Adams] purchased an orange and navy Houston Astros baseball hat, while Allen went to a liquor store to buy a Swisher and a drink.  While Allen was line waiting to pay, he saw [Adams] and Miller motioning for him to "Come on, bro, come on, bro."  Allen put his items back and left.  The trio returned to the car and took their same seats—[Adams] drove, Miller in the passenger seat, and Allen in the backseat behind Miller.

[Adams] exited the parking lot, made a U-turn onto Center Parkway, toward Mack Road, and then made a right turn onto Mack Road, heading towards Nelms, Harris, and Cooks, who were "just walking down the street."  Once they spotted the three men, Miller said, "That's the dude I got into a fight with—the dudes I got in a fight with in the Slopes."  Approximately one year earlier, Miller told Allen he had gotten into a fight with some "dudes" at the Sunnyslope Apartments (the Slopes), and one of the men had kicked him in the face and knocked him out.

[Adams] drove past the men and pulled into an apartment exit that was blocked by a gate.  [Adams] turned the car around so that it was backed up to the gate, aimed the gun at Nelms, Harris, and Cooks, and fired two or three shots.  Allen insisted that no one threw up any gang signs or made any comments prior to the shooting and that nothing was said after the shooting.  They just drove away like nothing had happened.  Allen denied that the shooting was part of any plan and said they were just driving around.  He also denied possessing the gun at any point that day or telling detectives that he had the gun and [Adams] snatched it from him.

After the shooting, [Adams] drove to a friend's house in the Elder Creek area where he stayed, while Miller and Allen took the car the visit Haynes's grave site.  Later that night, Miller sent Allen a text that read, "Keep that shit in the car, bro."  Allen claimed not to have received the text. Sometime after the shooting, [Adams] told Allen that if he was contacted by police, "Just don't talk about it, don't say nothing about it."  [Adams] also offered to take responsibility for the shooting if necessary.

Miller's mother's car, a dark-purple four-door Honda Accord, which "clearly matched the vehicle that was . . . seen in the video on the day of the murder," was searched on December 27, 2010, seven days after the shooting.  A black arm sling was found on the rear floorboard and gunshot residue was found on the headliner (the vehicle's internal roof).

Minutes before the shooting, Cooks saw a rusty, reddish colored four-door Honda pull in, back out a couple of seconds later, and then back into the side street.  He saw

3

three people in the car, one of whom was wearing a baseball hat with an orange brim. Cooks was walking next to Harris and talking to him when Nelms suddenly stopped and asked, "You see what they just did?" As soon as Cooks looked up, someone in the car began shooting. Cooks heard three or four shots. He did not see the gun but assumed the shots came from the backseat because the car was moving. Nelms, Harris, and Cooks took off running, but Nelms fell down and said, "I think I'm hit." Nelms died from a gunshot wound to his neck and chest.

Harris lived at the Slopes apartment complex in 2008 or 2009 and recalled seeing Miller there during that time. Harris acknowledged getting into fights at the Slopes but did not recall fighting Miller. Most of the fights Harris was in at the Slopes were gang related. Harris's cousin, a Crips gang member, sometimes provided "back . . . up" for Harris in those fights.

On February 17, 2011, [Adams], Miller, and Allen were arrested and taken into custody. Allen was interviewed by police following his arrest. At first Allen was hesitant to identify the shooter, but after the detective insisted Miller was "giving up with all that's happened," Allen admitted being in the car at the time of the shooting and identified [Adams] as the shooter. He claimed not to know why the shooting occurred. Allen recalled, "[I]t wasn't even no conversation honestly, it was we pass em [sic ]—," and "we backed in, and then psh [sic ]—and he just started shooting."

After being interviewed separately, [Adams], Allen, and Miller were placed in an interview room together where their conversations were recorded. Among other things, [Adams] told Miller and Allen, "[T]his is looking bad because of the prior events that you was involved in. T hey want to damn near probably put it as a gang, something with some gangs which you know (unintelligible) telling them that, you know what I mean? With a gang." Miller responded, "It's not. It's not." [Adams] continued, "Right, that can make a difference between a whole shit load of time."

At trial, Justin Saario, a detective in the Sacramento Police Department's gang unit, testified for the prosecution as an expert in African–American criminal street gangs. Saario explained that Starz and Guttah Boyz are subsets of the G–Mobb criminal street gang, and that G–Mobb is an acronym for G–Parkway. G–Mobb's main rival is the Oak Park Bloods and its subsets, the largest of which is FAB. Between 2008 and 2010, there were 26 shootings involving members of G–Mobb and the Oak Park Bloods. According to Saario, the Evergreen Shopping Center [Adams] drove to just prior to the shooting is a G–Mobb/Starz/Guttah Boyz stronghold.

The Oak Park Bloods have approximately 400 members, and its rivals are G–Mobb, its subsets, and the Crips, in general. They claim the color red, while the Crips claim the color blue. The Oak Park Bloods have several identifying hand signs, including making an "O" and a "P" with their fingers for Oak Park, making an "F", an "A," and a "B" with their finger for FAB, and making a "4" with their fingers for Fourth Avenue. Their primary activities are robberies, weapons possession, assaults with deadly weapons, predominantly firearms, and to a lesser degree narcotics sales.

Saario described three predicate acts of the Oak Park Bloods for purposes of establishing the elements of the gang enhancement. In 2005 several Oak Park Bloods went looking for a Crip to murder in retaliation for the murder of a "Valley High Piru."

4

Piru is another name for Blood. The group went to a known Crip hangout, and began shooting when a Crip exited a residence. During the altercation, an Oak Park Blood gang member accidentally shot and killed another Oak Park Blood gang member. The shooter was convicted of murder with a gang enhancement. In 2007 two Oak Park Bloods shot a woman who had complained about individuals selling drugs in front of her home. They pled to attempted murder with a gang enhancement. In 2008 an Oak Park Blood shot a man during an altercation between members of the Oak Park Bloods and a member of G–Mobb. The shooter was convicted of attempted murder with a gang enhancement.

Saario explained that respect in gang culture is different from "traditional respect" in that "it's a forced respect . . . . If—if you don't fear me, then you don't respect me. So, if you don't fear me, if you don't respect me, then I'm going to force you to respect me." Respect within the gang is earned by committing crimes. Disrespect must be met with consequences. Otherwise, one is viewed as weak.

Saario opined that Miller is an Oak Park Blood based on the totality of the circumstances, including his tattoos, conduct, and associations. Among other things, Saario relied on photographs of some of Miller's tattoos, various incidents in which Miller was involved, either directly or indirectly, in criminal activity with Bloods or Oak Park Bloods, and various photographs depicting Miller wearing red clothing, making various Blood and Oak Park Blood hand signs, and associating with known Blood and Oak Park Blood gang members.

Saario opined that Allen is an Oak Park Blood based on, among other things, Allen's admission that he is an Oak Park Blood, his ongoing association with Oak Park Bloods, and his involvement in gang related crimes.

Saario opined that [Adams] is a Blood gang member (as opposed to an Oak Park Blood) based on his tattoos, prior crimes, associations, and clothing. [Adams] has tattoos of the phrase "West Koast" and the word "Kalifornia." Saario explained that Bloods commonly replace the letter "C" with the letter "K" to show disrespect for Crips. Defendant also has a tattoo of the Los Angeles Dodgers's symbol, "LA," in red, instead of Dodger blue. Saario also detailed nine incidents between 1998 and 2010 in which [Adams] was contacted by police in the company of Blood gang members and/or engaged in what Saario deemed "gang-related activities," including marijuana possession, narcotics sales, a home invasion robbery, an armed robbery, and firearms possession.

Saario opined that the victim Nelms was a Crip based on items found at the memorial constructed at the place he was shot. Saario also opined that Cooks and Harris were members of Crips gangs based on items found at the memorial constructed at the place he was shot. Saario also opined that Cooks and Harris were members of Crips gangs based on photographs he had seen and the clothing they were observed wearing.[FN4]

> FN4. During cross-examination, Saario acknowledged that he had no information that Harris was a Crip or that Miller was an Oak Park Blood at the time of the fight in 2008.

5

>    Based on a hypothetical using facts similar to those present here, Saario opined that the shooting of Nelms benefited the Oak Park Bloods because it enhanced their reputation. He explained, "[B]y those individuals pulling the firearm and shooting at and subsequently killing an individual who previously disrespected an Oak Park Blood gang member, that absolutely enhances the reputation of the gang . . . . [T]hose individuals, and Oak Park's, reputation is going to be enhanced because they are willing to commit that type of violence in . . . Starz territory against Starz or anybody possibly being Starz." Saario continued that the Oak Park Bloods reputation would be enhanced even if thee individual who pulled the trigger is a Blood, not an Oak Park Blood, "because there is [sic] other Oak Park Blood gang members equally involved" in that they were with the shooter when the shooting occurred.

*People v. Adams*, No. C071954, 2014 WL 6836351, at *1-5 (Cal. Ct. App. Dec. 4, 2014).

At the conclusion of trial, Adams' jury found him not guilty of first-degree murder but guilty of the lesser included offense of second-degree murder. The jury also found him not guilty of the attempted murders, but found him guilty of possession of cocaine for sale and possession of a firearm by a felon. The jury also found true allegations that Nelms' killing was perpetrated by means of shooting a firearm from a motor vehicle with the intent to inflict great bodily injury, that Adams was armed with a firearm, that Adams personally used a firearm, that Adams personally and intentionally discharged a firearm causing Nelms' death in the commission of Nelms' murder, and that Adams was personally armed with a firearm during the commission of the drug offense. The jury found not true the gang enhancement allegations.

Following trial, the prosecution moved to nullify Allen's plea agreement on the ground that he had been untruthful in his testimony in Adams' case. The trial court agreed that Allen failed to testify truthfully regarding what happened in the minutes preceding the shooting and his handling of the gun. Adams moved thereafter for a new trial based on the newly discovered evidence that Allen had perjured himself at trial. The court denied the motion and subsequently

sentenced Adams to 45 years to life imprisonment plus a consecutive determinate term of 11 years' imprisonment.

Through counsel, Adams appealed his conviction, arguing in relevant part that: 1) the trial court abused its discretion in refusing to bifurcate the trial of the gang enhancement from the trial of the substantive offenses; and 2) the trial court erred in denying his motion for a new trial based on newly discovered evidence that Allen's plea agreement was nullified on the ground that he perjured himself during Adams' trial. The Court of Appeal unanimously affirmed the judgment against Adams in a reasoned, unpublished opinion issued on December 4, 2014. *Adams*, 2014 WL 6836351, at *10. Adams petitioned in the California Supreme Court for review of the claims unsuccessfully raised in the Court of Appeal. The Supreme Court summarily denied review on February 11, 2015.

Adams then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on May 9, 2016. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Adams argues, as he did on direct appeal in the state courts, that his federal constitutional rights were violated by two trial court errors. First, Adams contends that the trial court erred in refusing to bifurcate the trial of the gang enhancement from the trial of the substantive offense. He additionally avers that the trial court erred in denying his motion for a new trial based on newly discovered evidence.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A. Denial of Motion to Bifurcate (Ground 1)

Adams first argues that the trial court erred by failing to bifurcate the gang allegations from the underlying offenses, and the admission of evidence of gang violence violated his due process rights. The Court of Appeal summarized the following factual background when considering and rejecting this claim on direct appeal:

> The prosecution sought to admit gang evidence to prove the gang enhancement allegations against [Adams] and Miller and establish a motive for the shooting, namely that it was in retaliation for the Guttah Boyz murder of Haynes and shooting of Miller. [Adams] and Miller moved to bifurcate the trial of the gang enhancement from the substantive offenses, arguing gang evidence was irrelevant to the issue of motive because there was no evidence the shooting was gang-related. According to [Adams] and Miller, the only evidence was that the shooting was in retaliation for a fight between Miller and Harris a year earlier, which was not gang related. The prosecution opposed bifurcation,

9

> arguing that "to say that the only motive and the only contributing factor to this shooting was the fact that he saw a guy that he was in a fight with two years ago is . . . not correct." The prosecutor argued "there was a lot of other things going on that day . . . that contributed to that shooting besides just seeing Eric Harris, and every one of them relates to gang involvement by Mr. Miller." In particular, the prosecutor noted that Miller had been shot six days earlier in a shoot-out between members of G–Mobb and the Oak Park Bloods, Miller's close friend Robert Haynes had been shot by members of G–Mobb, and [Adams] and Miller were "at the Evergreen Shopping Center cruising around with a gun, which is essentially a G–Mobb . . . stronghold." The prosecutor also asserted that even if the motive for the shooting was the fight, as urged by [Adams] and Miller, the gang expert would testify about gang mentality, the concept of disrespect, and how the disproportionate response to the fight was part of that mentality. The trial court denied the motion to bifurcate, finding "the gang evidence is evidence with regard to potential motive and so therefore it is impossible to bifurcate it without actually providing the jury with a sterile case in somewhat of a vacuum."

*Adams*, 2014 WL 6836351, at *5.

As an initial matter, the United States Supreme Court has not determined that a criminal defendant has a federal constitutional right to bifurcation. *See Spencer v. Texas*, 385 U.S. 554, 565-66 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure"); *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*); *see also Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010) (holding there is no clearly established federal law "requiring severance where defendants present mutually antagonistic defenses"). "The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate." *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) (internal quotation marks and citation omitted); *see also United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial").

"In evaluating prejudice, the [federal habeas court] focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003). Undue prejudice exists "whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). The petitioner bears the burden of proving that she is entitled to federal habeas relief on this ground. *Davis*, 384 F.3d at 638.

Furthermore, even assuming that the denial of the bifurcation motion and resulting admission of the gang evidence in the trial on the substantive offenses violated clearly established Supreme Court law, that error is subject to harmless error analysis. *See Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998) (applying harmless-error analysis to due process violation arising from misjoinder); *Ghent v. Woodford*, 279 F.3d 1121, 1127 (9th Cir. 2002) (same arising from erroneous admission of evidence). Thus, the petitioner must establish that "the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 384 F.3d at 638 (internal quotations and citation omitted).

Here, to the extent Adams contends that the trial court abused its discretion under California law by failing to bifurcate the gang enhancement allegations, such claim is not legally cognizable on federal habeas review. *See Park v. California*, 202 F.3d 1146, 1150 (9th Cir. 2000) (alleged violation of California law due to misjoinder not cognizable in federal court); *see also Grisby v. Blodgett*, 130 F.3d 365, 270 (9th Cir. 1997) ("We do not depend on state law governing severance in state trials.").

11

Moreover, Adams fails to show that the failure to bifurcate the gang enhancements and the subsequent introduction of gang evidence at trial rendered his trial fundamentally unfair. As the Court of Appeal explained, much of the gang evidence was cross-admissible and relevant as to the murder charges:

> The prosecution claimed that Miller is a member of the Oak Park Bloods, and that [Adams] and Miller targeted Nelms, Harris, and Cooks because they believed Nelms, Harris, and Cooks were members of G–Mobb, the gang responsible for Haynes's murder and Miller's recent shooting. The prosecutor's offer of proof included the following: Miller is a member of the Oak Park Bloods; six days before Nelm's was shot and killed, Miller was shot in the arm during a shootout between members of the Oak Park Bloods and G–Mobb/Guttah Boyz; Haynes, a fellow Oak Park Blood and Miller's close friend, was killed by members of the Guttah Boyz; on the day of the shooting [Adams], Miller, and Allen went to the Evergreen Shopping Center, a Guttah Boyz stronghold, where they spotted Nelms, Harris, and Cooks; [Adams] was armed with a .38–caliber revolver; [Adams] followed Nelms, Harris, and Cooks when they left the shopping center; three to five gun shots were fired in rapid succession from the car [Adams] was driving; and Miller and Allen admitted they were present in the car during the shooting and identified [Adams] as the shooter. One reasonable inference from the prosecution's proffer is that the motive of the shooting was retribution for Haynes's murder and Miller's shooting. While one also might reasonably conclude that the motive of the shooting was retribution for the prior fight between Miller and Harris, and that the fight was not gang-related, it does not follow that the trial court erred in denying bifurcation. As the trial court correctly observed, where the record supports two or more reasonable inferences, it is for the jury, not the court, to decide which inference to draw.

*Adams*, 2014 WL 6836351, at *7.

The Court of Appeals' conclusion is both reasonable and fully supported by the record.

Likewise, Adams also fails to establish prejudice. It cannot be said that the case against Adams was improperly bolstered by a "spillover" effect from the gang evidence. Separate and apart from the gang evidence, there was overwhelming evidence of Adams' guilt based on the testimony and evidence provided at trial. Similarly, as the Court of Appeal recognized, "any danger that the jury would rely upon the gang evidence for an improper purpose was minimized by the court's limiting instruction." *Id.* at *8.

12

Indeed, it is not reasonably probable that Adams would have obtained a different result absent the admission of gang evidence given the jury's not-true finding on the gang allegation. As the Court of Appeal surmised:

> The jury's verdict strongly suggests that it was not swayed by the gang evidence to convict regardless of Adams' guilt. Significantly, the jury found [Adams] *not* guilty of the first degree murder of Nelms, but guilty of the lesser included offense of second degree murder, and *not* guilty of the attempted murders of Harris and Cooks. It also found the gang enhancement allegation *not* true.

*Id.*

The jury's verdict suggests that the jury was able to compartmentalize the evidence about gangs and the evidence as to Adams' culpability for the murder charges, and to set aside the gang evidence when analyzing Adams' culpability for the murder charges. *See Park*, 202 F.3d at 1150 ("[T]he failure of the jury to convict on all counts is 'the best evidence of the jury's ability to compartmentalize the evidence.'"). The Court therefore has no basis for finding unreasonable or contrary to federal law the state courts' rejection of Adams' claim regarding the trial court's refusal to bifurcate the gang enhancement from the other substantive crimes, and Adams is not entitled to relief on this ground.

B.     Denial of Motion for New Trial (Ground 2)

Adams additionally contends that the trial court erred in denying his motion for a new trial based on newly discovered evidence. The Court of Appeal considered and rejected this claim on direct appeal as follows:

> A. *Background*
> Following the trial, the prosecution moved to nullify Allen's plea agreement on the ground he "perjured himself at trial." The prosecutor argued Allen was untruthful in his testimony that (1) there were no conversations in the car prior to the murder of Nelms other than Miller's isolated statement regarding a prior fight, (2) neither Allen nor Miller did anything to encourage or aid in the shooting, and (3) it was a complete surprise to

13

Allen and Miller when defendant started shooting. According to the prosecutor, "[t]his issue was central to the case against *Darrell Miller*." (Italics added.) The prosecutor further asserted, "The jury found, contrary to Mr. Allen's testimony, that Mr. Miller did in fact aid and abet the murder of Nelms. The jury verdict is a strong statement that Mr. Allen was untruthful in this regard." The trial court agreed and nullified the agreement, finding that Allen failed to testify truthfully regarding what happened in the minutes preceding the shooting and regarding his handling of the gun.

Thereafter, [Adams] moved for a new trial based on newly discovered evidence, namely "the judicial decree that Mr. Allen has violated his immunity agreement." The trial court denied the motion, noting that its findings with regard to Allen's testimony "were discrete as to two particular aspects of his testimony," and the prosecutor "did argue to the jury that, in fact, Mr. Allen was not completely truthful. So the jury did have the ability to weigh and to consider the testimony of Mr. Allen."

B. *Law*

A trial court may, upon a defendant's application, grant a new trial when "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. 8.) To justify a new trial the "'newly discovered evidence . . . must make a different result probable on retrial.'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) We review the trial court's ruling denying the motion for a new trial under the deferential abuse of discretion standard. (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)

C. *Analysis*

Evidence Allen was untruthful in his testimony at trial is not new. During closing argument, the prosecutor acknowledged Allen lied. Indeed, [Adams'] trial counsel seized on the prosecutor's concession during his closing argument, asserting that the prosecutor was attempting to have it both ways by urging the jury to find Allen truthful in some parts of his testimony and untruthful in others, and urging the jury to find Allen untruthful in all parts of his testimony, "except maybe his name." Moreover, as the prosecutor noted in his motion to nullify the agreement, the jury necessarily rejected Allen's testimony concerning the lack of any discussion preceding the shooting and his and Miller's ignorance about what was about to happen in finding Miller aided and abetted in Nelm's murder.

Even if Allen's untruthfulness was "newly discovered" such evidence would not assist [Adams] on retrial because the testimony the court determined was untruthful benefitted [Adams]. Allen's testimony that nothing was said prior to the shooting other than Miller's comment, "That's the dude I got into a fight with—the dudes I got in a fight with in the Slopes," benefitted [Adams] in that it undermined the prosecution's assertion that the shooting was premeditated and done in retaliation for Miller's shooting and Haynes's murder as well as its assertion that the shooting was gang-related.

Finally, to the extent defendant contends the trial court's finding that Allen was untruthful is relevant to Allen's credibility generally, such evidence is cumulative. At trial, Allen repeatedly admitted lying to detectives about the events in question following

14

> his arrest, the prosecution acknowledged Allen was untruthful in some of his testimony, and [Adams'] trial [counsel] urged the jury to reject Allen's testimony in its entirety given the prosecution's acknowledgement and Allen's desire to save himself by testifying against [Adams] and Miller.
>
> The trial court did not abuse its discretion in denying [Adams'] motion for a new trial based on newly discovered evidence.

*Adams*, 2014 WL 6836351, at *9-10.

Adams fares no better on federal habeas review. Generally, the drastic remedy of a new trial should not be granted where the prejudice from improperly admitted evidence is not substantial and where curative instructions can mitigate the harm. *See, e.g.*, *United States v. Browne*, 829 F.2d 760, 766 (9th Cir. 1987). Under California law, a trial court has broad discretion to grant a mistrial. *See People v. Williams*, 148 P.3d 47, 72 (Cal. 2007).

To the extent that Adams is alleging a violation of state law in the court's denial of his mistrial motion, again, his claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67-68. But to the extent that he is alleging a federal due process violation, he has raised a cognizable federal claim. In order to establish a due process violation from an alleged error, such as the denial of a mistrial motion, a habeas petitioner must show that the error resulted in a trial that was fundamentally unfair. *See id.* at 70-71, 75; *Hayes v. Ayers*, 632 F.3d 500, 515 (9th Cir. 2011). The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. *See Estelle*, 502 U.S. at 73.

Here, the denial of Adams' motion for a new trial did not render his trial fundamentally unfair for the reasons extensively and persuasively explained by the Court of Appeals. The Court of Appeals' explanations are both reasonable and fully supported by the record. Accordingly, Adams is not entitled to relief on this claim either.

C.     Request for an Evidentiary Hearing

Finally, Adams requests an evidentiary hearing as to all claims. A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005). In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superseded by statute as stated in Williams v. Taylor*, 529 U.S. 420 (2000).

As discussed above, Adams has failed to assert a colorable claim for relief. *See Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding an evidentiary hearing is not required on issues which can be resolved on the basis of the state court record). Because he does not cite to new laws or underlying facts that were not developed on the record before the state courts with respect to this claim, he has also failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2). Adams' request for an evidentiary hearing must therefore also be denied.

## V. CONCLUSION AND ORDER

Adams is not entitled to relief or an evidentiary hearing on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 19, 2018.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge